## No. 13,324.

### IMMANUEL PRESBYTERIAN CHURCH VS. OWEN RIEDY.

#### SYLLABUS.

1. A district judge has authority during vacation, and before an appeal is completed, to modify an order of appeal granted on motion in open court, by reducing the amount of bond fixed therein for an appeal. Appellant could furnish the bond for a devolutive appeal at any time falling within the terms of the order of appeal.

2. The fact that the district judge may have fixed too low the amount for a bond for a devolutive appeal furnishes no ground for the dismissal of an appeal.

The remedy is to have the amount for the bond increased by proper proceedings in the lower court.

3. An appeal ought not to be dismissed as a general thing on a motion made *in limne* on account of an alleged defective condition of the transcript. It is possible it might, in its actual condition, properly contain enough data, properly certified, to enable the court to pass upon issues raised in the trial court sufficient in character to work either a final reversal of the judgment, or a remanding of the case. The court cannot anticipate what the issues involved are. (48 Ann. 715; 49 Ann. 1786; 50 Ann. 714; 51 Ann. 633.) If, upon examination, the record be found insufficient, the appeal will be either dismissed, or the judgment affirmed.

4. The fact that the clerk on making out a transcript may have inserted therein matters which should not properly be there, or should, without authority, have pasted original documents to the record, should not cause

the rejection of the appeal, but the ignoring and rejection of such documents or papers. (Succession of Fortier, 51 Ann.)

5. The practice of omitting from the record documents filed in evidence and sending them up in the original, is without authority to rest upon. The district judge is without authority by an *ex parte* order, to vary the law touching what should be inserted in or sent up on appeal *dehors* the transcript.

The law requires documents and evidence to be filed and on appeal to be transcribed and placed before the Supreme Court under the clerk's certificate. (C. P. 585-586.)

ON THE MERITS.

The treasurer of the board of trustees of a religious corporation who is entrusted with the safe-keeping and disbursement of a trust fund, can be held liable for same and adjudged to make restitution thereof, if same has been by him received and applied to the payment of his salary as pastor of the church congregation, notwithstanding the money was withdrawn upon formal resolutions of the board of trustees and subsequently paid to him.

Such resolutions are *ultra vires* of the board of trustees, and the knowledge of the pastor is that of the treasurer, who is the incumbent of both offices at one and the same time.

The treasurer is liable personally and independently of his responsibility as a member of the board of trustees.

A PPEAL from the Civil District Court, Parish of Orleans— *Ellis, J.*

*Benjamin Rice Forman* for Plaintiff, Appellee.

*Omer Villere* and *Edwin T. Merrick* for Defendant, Appellant.

The opinion of the court, on motion to dismiss appeal, was delivered by NICHOLLS, C. J.

On the renewal of motion to dismiss the appeal, and on the merits, the opinion of the Court was delivered by WATKINS, J.

ON MOTION TO DISMISS.

The opinion of the court was delivered by

NICHOLLS, C. J. Plaintiff has moved to dismiss the appeal taken in this case on the ground:

1. That no bond has been filed as required by the order of appeal of 30th June, 1899, and as required by law. C. P., 574 *et seq.*

2. Because the district judge had no jurisdiction or power in vacation and after the term at which the judgment was rendered by an *ex parte* motion out of court, and in vacation, to grant any order of appeal or fix the amount of the appeal bond as was attempted on 7th July, 1899, after the adjournment of the court for the term.

3. The amount of the bond, as filed, is insufficient to secure the payment of the costs as required by law.   (C. P. 578.)

4. The appellant, Owen Riedy, has not filed in this court, on the return day, a transcript of all the proceedings, pleadings, minute entries, and of all the documents as required by law (C. P. 585-588), and Rule 1 of the Supreme Court; on the contrary, in violation of law, the so-called record filed here, from pages 178 to 327, instead of being *copies,* appear to be original documents, notarial acts, split up depositions within other States; the interrogatories, exhibits, separated from the answers and what purports to be original manuscript and printed books, which should have been copied.

Judgment in favor of the plaintiff, against defendant, was rendered by the District Court, Division "A," on the 26th of June, 1899, and signed on the 30th of the same month.

On this last mentioned day, on motion of attorneys of defendant, it was ordered by the court that a devolutive appeal be granted from said judgment, returnable to the Supreme Court of Louisiana on the 1st Monday in November, 1899, on mover furnishing bond for costs in the sum of one thousand dollars.   On the 7th of July, 1899, there was filed in court and entered on the minutes of Division "A" of the court, and filed as a motion, an application reading as follows:

"Immanuel Presbyterian Church vs. Owen Riedy, No. 53,653, Division "A."

"*To the Civil District Court for the Parish of Orleans*:    .

"On motion of E. T. Merrick and Omer Villere, of counsel for Owen Riedy, and on suggesting to the court that the bond for a suspensive appeal herein fixed at one thousand dollars is too high, and that a bond of five hundred dollars will more than cover the costs of appeal. It is ordered that the bond for a devolutive appeal herein be fixed at five hundred dollars.

(Signed)    "T. C. W. ELLIS, *Judge.*    .
"New Orleans, La., July 7th, 1899."

On July 24, 1899, a bond of appeal was filed in the Civil Court,

signed and dated on the 30th of June, for the sum of five hundred dollars. The character of the appeal taken is not mentioned. The bond in its condition follows the provisions of Article 579.

The transcript was lodged in the Supreme Court on Wednesday, November 8th, 1899.

The only order of appeal which we find in the record is that copied above, which is for a *devolutive appeal* on a bond of five hundred dollars. The recital in the paper filed on the 7th of July, 1899, that the "bond for a *suspensive appeal* herein, fixed at *one thousand dollars,*" had no basis to rest on, and was evidently a clerical error and should have read "devolutive appeal."

In his certificate attached to the record, the clerk certifies that the "foregoing three hundred and thirty-two pages do contain a true, and correct transcript of all the proceedings had, documents copied in compliance with instructions of counsel for appellant, and order of court copied on folio 332 (except reasons for judgment which, after careful and diligent search, could not be found), and evidence adduced upon the trial of the cause wherein Immanuel Presbyterian Church is plaintiff, and Owen Riedy is defendant, instituted in this court and now on the records thereof under the numer 52,653 of this Honorable Court, Division 'A.' T. C. W. Ellis, Judge."

The order of court referred to in this certificate was granted in Division "A" of the Civil District Court on the 7th of August, 1899, by John St. Paul, Judge of Division "C," acting for T. C. W. Ellis, Judge of Division "A," absent from the State, on motion of E. T. Merrick and Omer Villere, attorneys for Owen Riedy, upon their suggesting on his behalf that all his property had been seized in the suit; that he was left destitute and could not pay for a large transcript.

The order read as follows:

"It is ordered that the following documents be sent to the Supreme Court in the original as part of the transcript of appeal.

"1.   The minute books and the books containing the translation of the minutes.

"2.   The account books herein filed.

"3.   The two printed books herein filed.

"4.   All the copies of notarial acts herein filed.

"5.   All type-written copies annexed to depositions.

"6.   All type-written copies of documents.

"7. All the original receipts, letters and notes showing original signatures of the trustees of the plaintiff church."

We do not find that this order was granted with the consent of the plaintiff or contradictorily with him.

## OPINION.

1. The order of appeal of 30th of June, 1899, required for an appeal a bond for $1000.00. The amount was subsequently reduced by the court to $500 (five hundred dollars).

A bond was furnished for that amount.

2. We do not find any *order of appeal* to have been granted by the district judge in vacation and after the term at which the judgment was rendered. The order was made by motion in open court during the term.

There was simply, after the adjournment of court, a modification of the order in so far as related to the amount of bond to be furnished.

This modification was not a new order of appeal, nor did it destroy the original order. The judge had the authority during vacation, and before the appeal was completed, to reduce the amount for the bond if he thought it too large. Gibson vs. Selby, 2 Ann. 629; Holbrook vs. Holbrook, 32 Ann. 13.

Appellant could furnish the bond for a devolutive appeal at any time within the year during which the devolutive appeal could be taken (McWaters vs. Smith, 25 Ann. 515), even if the motion for an appeal was made as soon as the judgment was rendered.

3. The fact that the judge of the District Court may have fixed too low the amount required for an appeal furnishes no ground for a dismissal of the appeal.

The remedy was to have had the amount increased in the lower court by proper proceedings.

4. We do not think we should dismiss this appeal upon a motion *in limine* on account of the alleged defective condition of the transcript. It is possible that in its present condition it may properly contain enough data, properly certified, to enable the court to pass upon issues which may have been raised in the trial court, which are sufficient in their character to work a final reversal of the judgment or a remanding of the case.

We cannot anticipate what the issues involved are. Saw Mill and

Manufacturing Co., in Liquidation, 48 Ann. 715; Succession of Duffy, 50 Ann. 714; Brown vs. Land Co., 49 Ann. 1786; Heirs of Marmion vs. McPeake, 51 Ann. 633.

If, upon an examination of the record, we find it insufficient for the purpose of rendering a decree upon it, we will dismiss the appeal.

The fact that the district clerk, in making out a transcript, may have inserted therein matters not proper to be there, or should, without authority, have pasted originals to the record, should not cause the rejection of the appeal, but the ignoring and the disregarding of such documents or papers. Succession of Fortier, 51 Ann.

We think it proper to say that the practice of omitting from the transcript documents filed in evidence and sending them up in the original is without authority to rest upon.

As far back as Hayes vs. Clarke, 12 Ann. 666, this court said: "Under the peculiar circumstances of this case, we have looked into the original records sent up and completing the record of the case. But as the original records are liable to be lost, when taken from the proper offices, we take occasion to say that hereafter the original papers of other offices will not be received to complete a record pending in this court."

It is quite probable that the originals sent up in that case were of papers which had been also filed in evidence and copied in the record and simply additionally brought up for inspection.

For a much stronger reason should originals of papers, not to be found in the record, be brought up for our consideration.

The law requires documents and evidence to be filed and on appeal to be transcribed and placed before us under the clerk's certificate. C. P. 585, 586.

We have, sometimes, upon the express written consent of all the parties to the litigation, to avoid expense, permitted them on specifications of what papers are covered by such consent, acted upon records and papers irregularly before the court, but the district judge is without authority, by an *ex parte* order, to vary the law touching what should be inserted in or sent up on appeal *dehors* the transcript.

Papers sent up not covered by the clerk's certificate reach us with no official proof either of authenticity or of having been received in evidence in the trial court, and outside of any question of authority innumerable disputes between counsel would be the inevitable result of sanctioning such a departure from correct practice. Counsel of ap-

Church vs. Riedy.

pellee strenuously objects to our taking cognizance of anything outside of the record and of the clerk's regular legal certificate, and his objection is well grounded. Woodlief vs. Logan, 51 Ann. 1934.

The motion to dismiss the appeal *in limine* is denied, without prejudice.

## ON RENEWAL OF PLAINTIFF'S AND APPELLEE'S MOTION TO DISMISS THE DEFENDANT'S APPEAL.

WATKINS, J. The motion to dismiss the appeal was filed, assigned for trial separately from the merits, and submitted; and same was examined and decided adversely, with the intimation that appellee's right to renew its contention on the trial of the merits would be entertained—"the motion to dismiss the appeal *in limine* (being) denied without prejudice."

There were, originally, two grounds of dismissal urged, which were technical, and related to the sufficiency of the bond of appeal, and the manner in which the transcript was prepared.

But, in our view, these technical objections have disappeared, and the only consideration that may now be given them, must be restricted to their bearing on the merits which have been argued and submitted, and are now under consideration. Succession of Fortier, 51 Ann. 1563.

In that case we announced our opinion to be, that this court "is reluctant to dispose of the rights of parties on questions of law, raised on motion to dismiss the appeal."

The argument which is now pressed upon our attention is (1) that certain papers and documents introduced in evidence in the court below, were annexed to the transcript and brought up in the original, and not copied into the transcript conformably to law; (2) that certain of the aforesaid documents and records were neither copied into the transcript, nor brought up in the original.

The record shows, and the fact is admitted by counsel for appellee to be, that the originals specified, were brought up under and by the express authorization of the judge *a quo,* and same were particularly enumerated in his order; consequently, that is not a fault—if fault it be—which is attributable to the appellant.

The record before us affords the information that this is, apparently, a civil controversy between a religious corporation and its former pastor, with reference to an alleged misapplication of a certain sup-

posed trust fund which is in the custody of its directors, to the payment of the latter's salary through a series of years—the plaintff claiming a restitution or reimbursement of same, and the defendant averring receipt thereof upon proper authorization of resolutions of the directors.

We gather from the printed briefs and oral argument, that one of the important and possibly crucial questions in the case, is the authenticity of the acts of the board of directors and the genuineness of the signatures of the officers of the church corporation, and the verity of handwriting, etc.; and that the defendant pastor had an interest in the exhibition of the originals to this court; and the interest of the church appears to be just the other way.

In our former opinion, we said:

"We do not think we should dismiss this appeal upon motion *in limine* on account of the alleged defective condition of the transcript. It is possible that in its present condition, it may properly contain enough *data,* correctly certified, to enable the court to pass upon issues which may have been raised in the trial court, which are sufficient in their character to work a final reversal of the judgment, or a remanding of the case. We cannot anticipate what the issues involved are"— citing authorities.

"If upon an examination of the record, we find it insufficient for the purpose of rendering a decree upon it, we will dismiss the appeal."

We have not yet fully examined the record, which is quite voluminous, but enough appears from an examination already made, taken with the arguments and briefs, to justify the conclusion that the case can be examined in its present condition, without prejudice to the rights of the appellee.

Viewed from this standpoint, we are of opinion that the purposes of justice would be best subserved by the maintenance of the appeal; consequently, the appellee's motion to dismiss is denied.

## ON THE MERITS.

This suit was brought in the name of the church corporation against the defendant as its former agent and treasurer, for the restitution and return of the sum of $10,947.90; and from a judgment in its favor, the latter has appealed.

The statement of plaintiff's petition is that Kasper Auch of the city

of New Orleans, by his last will, bequeathed the *residuum* of his estate to the Presbyterian churches of that city, for the use and benefit of the poor of said churches, and that the proportional amount to which it was entitled amounted to $10,947.90.

That said sum was paid over by the executors of the deceased to the defendant "claiming to act for, and as the agent of your petitioner." The averment is then made that the defendant is not its treasurer, and that at a meeting of the board of trustees, of date March 5th, 1897, a resolution was adopted to the effect, that demand should be made of the defendant for the return of said sum of money, and upon his failure to do so, that suit should be brought against him for the recovery of same.

The petition then avers, that the president and treasurer made demand upon the defendant for the payment of that sum, and for the surrender of all the property belonging to the church and then in his possession, viz: "The titles to the church property, insurance policy, communion service and the books, papers and records belonging to the trustees," etc.

The plaintiff supplemented its petition and attached all of the defendant's property; and, thereafter, filed another supplemental petition, and endeavored to sequester some premium bonds as belonging to the Kasper Auch Fund.

The defendant made an unavailing effort to quash the writ of attachment as having been improvidently issued, and then filed an answer, and plead a general denial. He subsequently filed a supplemental answer denying the justice and truthfulness of the charges upon which the aforesaid writs were claimed, urging their dissolution as a matter of the merits, and set up in reconvention a claim in damages, both remunerative and compensatory, aggregating several thousands of dollars; and, also, a further claim in reconvention for the amount due him for arrears of salary by the church, upon the score of services rendered thereto as its pastor for a long series of years, and aggregating several thousand dollars in amount. This last claim was only made in the alternative that judgment should go against him on the principal demand, his contention being that the money he had received was in payment of his services as pastor, by the church; and, in the event that he was compelled to return the money he received as salary, he was entitled to a decree in reconvention against the church corporation for

the amount thus shown due by the alleged discovery that the payments, as made, were made in error.

The judge *a quo* having overruled the defendant's motion to dissolve the attachment, did not examine or pass upon his first reconventional demand; and, considering the second one as neither necessarily connected with, nor growing out of the principal demand, he declined to allow evidence in support of it—both parties residing in the same parish. In this situation, the trial was begun, and during the progress of the introduction of plaintiff's evidence, defendant's counsel, for the first time, made the discovery that the purported resolution of the board of trustees authorizing the suit had not been adopted by a quorum or majority of same—this fact having been made to appear from the minutes of the board of trustees which were kept in the German language, and had been translated into English for use upon the trial of this cause—filed an exception to the want of capacity of a minority of said board to adopt said resolution, and to institute this suit; and a further exception of no cause of action, which was directed at the board's lack of authorization by the church organization to either adopt said resolution, or institute the suit in the name of the corporation, or its members.

It appears that this suit was resolved upon by a number of the board of trustees, less than a majority, and at a meeting convened for the purpose, they proceeded very summarily, to elect one of their number treasurer of the board, and also of the Kasper Auch Fund, in the place and stead of the defendant, who had been acting in that capacity for many years, and very acceptably to all appearances, until it was discovered, as plaintiff alleges, that he had improperly used and disposed of the trust fund which was left in his charge, and had become an unfaithful agent by not making restitution thereof when called upon by the newly elected treasurer and president of the board of trustees.

The theory and character of this action being that of a proceeding by the board of trustees against a third person who had been its treasurer and the treasurer of a trust fund belonging to the corporation, for an accounting therefor, it is perhaps true that the defendant's reconventional demand for salary due him by the corporation was inadmissible, for the reason that the corporation is not the party plaintiff, and, therefore, no judgment could be rendered against it for salaries due the defendant as its pastor.

The two causes of action are distinct and altogether different. The one raised on the petition is for the restitution of a trust fund in which the defendant figures as an unfaithful agent, or treasurer of a trust fund; and on the issues raised on the reconventional demand, the corporation figures as the debtor of its pastor's unpaid salary. The parties reside in the same parish, and the two demands are neither necessarily connected with, nor incidental to each other; and on account of variance in the character of the two demands, compensation can neither be pleaded, nor maintained.

In so far as the defendant's exception to the capacity of the board of trustees to institute this suit is concerned, we are of opinion that same was dilatory in character, and out of time, because same had been tendered after answer filed and the trial had begun. It is true that the fact complained of was unknown to the defendant prior to the introduction of the minutes in evidence; but the record fails to disclose that any timely effort was made on the part of the defendant to obtain view or oyer of same before the cause was put at issue by an answer. We think this objection came too late, and that it was properly overruled.

The defendant's counsel sought to dissolve the attachment, on the ground that the writ of attachment issued for less than the sum demanded in plaintiff's petition, and the bond for attachment was given for an amount corresponding with the writ—the writ and bond being for $4500.00 and the demand being for over $10,000.00.

The question here presented is identical with the one raised and decided in the recent case of Hughes vs. Mattes, No. 13,412—the court, by a majority of its justices, sustaining the legality of the writ.

For the reasons therein assigned, the ruling of the judge *a quo* is affirmed, and the attachment sustained.

The defendant's plea of no cause of action, relates to the question of responsibility *vel non* of the defendant as a member of the board of trustees, to the church corporation for the restitution of the trust fund, but it is inadmissible at this time, because that question is not before us—the sole issue being the extent of the defendant's responsibility for trust funds had and received as treasurer, and misapplied.

The scope of this enquiry being thus limited, it is competent for us to so consider and deal with it, and to this extent the plaintiff's petition states a cause of action, and the defendant's exception was properly overruled.

It appearing that the plaintiff failed to obtain possession of the

premium bonds under the writ of sequestration, it was properly elim-inated from the case.

Passing from these identical issues to a consideration of the merits, a brief examination of the salient facts, as they appear in the record, will be necessary.

The Kasper Auch Fund was, by the terms of the will of the deceased benefactor, as well as by the tenor of the opinion of this court, destined to pious uses, and for the express benefit of the poor of the church. Succession of Kasper Auch Fund, 39th Ann. 1043.

It is evident that the safekeeping, care and investment of this fund was in the hands of the corporation; and its management was only incidentally entrusted to the trustees of the corporation, outside and independent of the powers with which they were endowed by the charter of the corporation.

This being the case, the misapplication of the fund was a wrong to the poor of the church who were the beneficiaries, and to the church organization only indirectly; and it seems to be the reasonable and proper duty of the church organization in its own name to proceed directly against all the guilty parties at one and the same time, as far as practicable.

The claim is made on the part of the defendant, that he had been the pastor of the church of the plaintiff corporation continuously, for a period of twenty years immediately previous to the institution of this suit; and that during a like period of time. he had been a member of the board of trustees of said corporation, and had been, by them, regularly and annually chosen as the treasurer of the corporation.

That when in 1888, the Kasper Auch Fund became available, he was, by the board of trustees, authorized to receive and receipt for it; and when received, he was made treasurer of same. The minutes kept of the proceedings of the board of trustees, as well as of the transactions in relation to the trust fund, are recorded in separate books; and said books have been brought to this court in the original, for the better examination of the entries therein made contemporaneously with the transactions themselves. Indeed, they may well be considered as object lessons from which the *character* of the dealings had with this trust fund may be determined.

The first entry made in the "Account Book of the Poor Fund," bears date June 1st, 1888, and the amount is $7,290.78.

In the "English translation of minutes" of the board of trustees of

date April 23, 1888, is found recorded an entry to the effect that Owen Riedy be "constituted a committee on behalf of this board and church," and clothed with authority to sell certain real estate which had been donated to the church by Kasper Auch, and to make a title thereto, for the sum of $5000.00 or more.

On the minutes of June 4th appears the statement that "the treasurer reported that he had received $7,290.78 of the legacy of the late Kasper Auch to this congregation, and that he had deposited, or brought same into the Germania Insurance Company and Safe Deposit Vault, in the name of the congregation, for safekeeping until further orders. The report was heard with satisfaction and adopted."

The minutes of December 10th, 1887, show that at an annual election held on the 5th instant, the following board of trustees were chosen, viz: (1) Frederick Morman, (2) Heinrich Rebenack, (3) Karl Rebenack, (4) Joseph Stein, (5) Frederick Wartman, (6) Owen Riedy, and (7) Valentine D. Stein—seven in number in keeping with the charter.

When the intelligence first came to the church that the will of Kasper Auch had made a disposition in its favor, the board of trustees, at an extra meeting, passed a resolution, accepting the bequest, on June 15th, 1886; and it was, by the board, unanimously resolved "that Owen Riedy be nominated and constituted a committee to represent this board and church in all matters appertaining to said legacy, as fully as said board and church can or could do by direct action through its regularly constituted officers."

The foregoing minutes were regularly prepared, read, and explained in German; and same were adopted by the meeting and signed by the secretary—the president of the board being present and participating in the proceedings.

At that time, the defendant was the treasurer of the church, and, also, pastor of the congregation, and at a meeting of the board, on April 4th, 1897, a resolution was unanimously adopted requesting "the Board of Home Missions for a renewal of the commission of the Rev. Owen Riedy for another year beginning May 1st, 1887, at the rate of $300.00 per annum." It further pledged the "congregation to raise $400.00, thus making up a yearly salary of $700 for our minister, the minimum sum needed for a decent support for him."

The minutes of June 9th, 1888, disclose that the minister, Owen Riedy, as the "attorney in fact for the board and the church", had col-

lected additional amounts on the legacy, and a resolution was adopted to the effect that same "was received with gratification * * * and the *minister* was instructed to place this money, notes and bonds, also, in the Germania Insurance Company Safe Deposit Vault, until further orders, for safety and safe-keeping."

Thus far the collection and deposit of this fund was dealt with specially by the board of trustees; and in its collection and deposit, the defendant acted in the capacity of *minister and pastor of the church,* and, as such, was deputed agent and mandatory of the church.

At the same meeting of the board of trustees, by-laws were prepared for the regulation and administration of the Kasper Auch fund; and same were read and adopted by the unanimous vote of "a congregational meeting of the Immanuel Presbyterian Church".

These resolutions were signed by the president and secretary of the board of trustees, and also by the president or chairman of the congregational meeting.

The following extracts from the by-laws thus adopted will suffice for present consideration, viz:

Article I provides that "the money bequeathed to this church by Kasper Auch, deceased, shall form a *poor fund; the interest and revenue therefrom shall be for the benefit of the poor of this church,* according to the wish of the testator. The capital shall remain intact."

Article II provides that *"the board of trustees and the pastor of the church shall safely and advantageously invest the capital* of this poor fund, and *transfer all the revenue from this fund into the treasury for the poor, and keep a special account of this fund,* and at the close of each year, *make a report to the church* concerning (same)."

It further provides that "uninvested capital, at any time, mortgages, bonds, notes and other valuable papers belonging to this fund, the *pastor shall take care of,* or put in safety".

Article III provides that *"the deacons and the pastor* of the church shall have the *management of the revenue of this fund; and the pastor shall be the treasurer.* They have to investigate and determine *what members need and should receive aid.* In doubtful or disputed cases, they may require the opinion of the session of the congregation.

"At the close of each year, they shall make a written yearly report to the board of trustees." (Our italics.)

Article IV provides, that if "members be too poor to pay their fees to the church, they may be paid for them, from the treasury of the

poor; and the tuition of the children of such poor members who attend the school of the church may be paid from this treasury. The sum of monthly contributions which each member is obliged to pay, is to be fixed according to the charter of the church by the board of trustees of the church."

The result of this examination is, that the defendant, as pastor of the church, was authorized to collect and take charge of the Kasper Auch fund; and that at the same time, his annual salary was fixed at $700.00, and of this sum, $300 was to be paid by the Board of Home Missions, and $400 by subscriptions taken from the congregation.

That in the by-laws adopted by the congregation, provision was made that if any members should be too poor to pay their fees to the church, same might be paid from the treasury for the poor; and that the tuition of the children of such poor members who attend the school of the church might be paid from the same source.

That "the money bequeathed to this church" constituted "a poor fund", and the "interest and revenue therefrom", were dedicated "to the benefit of the poor of the church"; but the capital was to remain intact.

That the duty was jointly and severally imposed upon *the board of trustees and the pastor* (to) safely and advantageously *invest the capital* of this poor fund, and *transfer all the revenues from this fund* into the treasury of the poor; and to keep *a special account* of same", and to make an annual report of their dealings with this fund "to the church."

That all uninvested capital, mortgages, bonds, notes, etc., and all valuable papers, were to be left in the safe-keeping of the pastor *exclusively,* as custodian or depositary; the duty of making *investments* of capital, and the *transfer* of interest and revenues being *jointly imposed upon the board of trustees and the pastor.*

That when interest is collected by the board of trustees and the pastor, from any investments they shall have made, and they shall have transferred the same to the poor fund and thus placed it in the exclusive custody of the pastor, as the treasurer of said fund, the *deacons and the pastor* of the church are given the *joint* management and administration of said revenue, and the disposition thereof in keeping with the said provisions of the by-laws. That the only duty of the defendant, as treasurer of this trust fund, was that of safe-keeping of the uninvested capital, undisbursed revenues, notes, bonds, etc.; and that in the manner and propriety of making *investments* of capital his authority and responsibility are shared by the board of trustees; and in the man-

ner and advisability of making *disbursements* of revenue, his authority and responsibility are shared by the deacons of the church.

That the amounts of contributions to be withdrawn from this fund in liquidation and settlement of the fees due by the poor of the church, and the tuition of their children, are exclusively left to the board of trustees, and in pursuance of the charter of the church; with this matter the pastor has, personally, nothing to do. It is from this standpoint we must investigate the manner and circumstances under which this fund was invested or consumed, and upon which must necessarily rest the charges that are preferred against the defendant as an unfaithful agent.

The following facts are disclosed by the books that were kept by the board of trustees and approved by them:

From the "account book of the poor fund" it appears that, on the 30th of December, 1899—something more than one year after same had been received—there was on hand in cash and notes, with some interest collections, the aggregate amount of $10,593.71; but of this sum there was only the sum of $465.85 in cash—there having been invested, approximately, $10,000, presumably by the joint authority of the board of trustees and the defendant, as pastor.

It appears from said account that on the 12th of July, 1888, $300.00 was loaned to Henry Krow; on July 25th, 1888, $200.00 was loaned to Mrs. Mining; on August 6th, $2000 was loaned to the church; on August 16th, 1888, $2345.25 was loaned to Bergal Shall; on the 3rd of September, 1888, $370.36 was loaned to the church—these several amounts aggregating the sum of $7,215.61. On June 1st, 1889, there was loaned to Charles and Henry Rebenack, $1866.00; and on January 1st, 1890, there was loaned to the church $848.92—thus increasing the aggregate amount loaned to $9,930.53, and the aggregate amount loaned to the church to $5,219.28.

In the effort to make out a case against the defendant, the charge is made by plaintiff's counsel—and his insistance in argument is, that the same is supported by the evidence—that the transaction with the two Rebenacks was collusive, if not surreptitious, and was resorted to as a means of enabling the defendant to conceal the same and benefit by the deal. His further charge is, that the transaction by which money appears to have been loaned to the church, was in reality only given this appearance as a means of enabling the defendant to illegally apply same to his alleged arrearages of salary; and that by this instrumental-

ity the church corporation has been imposed upon, and of this imposition, he was the sole beneficiary.

The minutes of the board of trustees of July 12th, and August 6th, 1888, show, that the two loans of those dates were approved. In the minutes of the latter date, there is a resolution to the effect that "as our pastor, Owen Riedy, with great self-denial, and making a great sacrifice, has now served the congregation fully eleven years without once forsaking it to take a trip of recreation or have a vacation; whereas, besides the performance of his official duties as minister, he also served the congregation during almost the whole of the time, as organist, Sunday-school teacher, and superintendent; and whereas he represented the board of trustees and the congregation, in the very important matter of the legacy of the late Kasper Auch, and thereby rendered the congregation a very valuable service; therefore

"Be it resolved, that the board of trustees give him, in the name of the congregation, fifty city premium bonds, $20.00 each (face value) as a small remuneration for the above mentioned special and extraordinary services."

There was a further resolution to the effect that, inasmuch as "the congregation now needs money to pay for extensive repairs to the church, for a new school house, and for an organ, and other debts, therefore,

"Be it resolved, that the board *borrow, on the credit* and name of the congregation, $1000.00 in cash, and fifty city premium bonds * * * from the poor fund of the congregation at 3 per cent. per annum interest and that the officers of the board execute this (loan)."

The minutes recite that a quorum of the board was present and that the proceedings were presided over by the president; and same were signed by Charles Rebenack, as president, and countersigned by H. Rebenack, as secretary *pro tem.*

There is nothing in the minutes to indicate that the defendant was either present or participated in the meeting.

At the meeting of the board on the 3rd of September, 1888, a further sum of $1970.36 in cash, and $400.00 in twenty city premium bonds were borrowed "in the name and upon the credit of the congregation * * * from the poor fund at three per cent. per annum interest", and the officers of the board were directed to carry out the resolution—the two amounts aggregating $2370.36, as stated in the treasurer's report of the trust fund.

The minutes state that a quorum of the board was present and they were signed and approved by the president and secretary; but they do not show that the defendant was present or participated therein. The minutes of that meeting show that the loan of $2345.25 to Bergal Shall, on mortgage, was approved; and the minutes of January 5th, 1889, with great particularity, show how the different sums were expended by the defendant as treasurer of the church.

Amongst the disbursements shown are the following, viz:

   a. For extra services of defendant ............$1000 00 .
   b. For school-house, closet, etc................ 1000 00
   c. For "salary of minister due since 1877 to
         September, 1888, as per resolution"...... 2370 36—$4370 36

The minutes show that a quorum was present, and that the same were duly approved and signed by the president and secretary; but they do not show that the defendant was present or participated in the meeting. The minutes of May 6th, 1889, show that a loan to Karl and Heinrich Rabenack was authorized at six per cent. interest to enable them to purchase a piece of ground, and the treasurer was instructed to carry out the resolution.

The account of the poor fund shows that a loan of $2500.00 was made to the Commercial Homestead Association on the 29th of August, 1890; and the minutes of October 6th, 1890, show that the mortgage notes of B. Shall were paid, principal and interest.

On the 10th of January, there was on hand $1254.59 in cash uninvested, and there were in the possession of the defendant as treasurer, the (1) note of the Homestead Association—$2500.00; (2) note of Mrs. Mining—$200.00; (3) notes of the church for $2000.00, and $1866.00, and $2370.00 and $848.92—and a few notes of small amounts. That account shows that $500.00 was loaned to Englander on March 3rd, 1891; and $1100.00 was invested in the purchase of the mortgage notes of Mrs. Mining, on March 13th, 1891.

On the 22nd of August, 1891, a further loan was made to the church of $870.00; and on the 3rd of October, 1892, a further loan was made to the church of $750.00.

At the time, there was a cash balance of $322.96 on hand; and on December 29th, 1893, there was a cash balance of $620.64 on hand.

On a general statement of date January 7th, 1895, are entered as on hand the following notes, viz:

Church vs. Riedy.

(1)  Of Immanuel Pres. Church..............$2000 00
     Of Immanuel Pres. Church.............. 2370 00
     Of Immanuel Pres. Church.............. 848 92
     Of Immanuel Pres. Church.............. 746 44
    . Of Immanuel Pres. Church.............. 870 00
     Of Immanuel Pres. Church.............. 750 00—$7385 36

There are sundry other notes representing the balance of the fund, less $297.47 in cash; and the account was practically unchanged on January 1st, 1897, and on December 14th, 1897, when there was only $2.97 in cash on hand.

The various reports of the treasurer of the trust fund were approved by the president and secretary of the board of trustees, and as an illustration of same, we append the following, viz:

"The treasurer's foregoing annual statement and cash account of the poor fund was read and approved in the meeting of the board of trustees. January 7th, 1895. (Signed) Frank Mining, President. H. Rebenack, Secretary."

A similar approval is endorsed upon the treasurer's annual statement of January 6th, 1896; and, also, that of January 4th, 1897.

There is in plaintiff's petition no disavowal of the regularity or authenticity of the minutes as prepared and approved, during a series of twenty odd years; and, to all appearances, the *present* treasurer of the board has possession and custody of the notes and mortgages which represent the various loans.

The theory of this suit seems to be that the entire trust fund passed into the hands and under the control of the defendant, as treasurer of the church organization, and that the board of trustees have resorted to this means of calling him to account therefor. That a resolution of the board of trustees directed that proper demand be made for the restitution of the trust fund, and that, upon his failure to account therefor, this suit was filed.

*Per contra,* the contention of the defendant is, that the trust fund was placed under the joint control of the board of trustees and himself, as the pastor of the church, under special by-laws provided by the congregation of the church, at a general meeting held for that specific purpose. That the fund received passed under their control, and was, by the board of trustees, regularly and legally invested, as the by-laws aforesaid directed and required. Indeed, the special object of the by-

laws was to provide means for the safe investment of this fund, to the end and with the distinct purpose in view that revenues should be received therefrom so as to meet the pressing wants of the poor of the church, in keeping with said bequest. That the fund never passed under the dominion or control of the trustees, or himself, as treasurer of the church; but it passed under the joint control of the board of trustees, and himself as pastor, pursuant to the aforesaid by-laws, and not otherwise. Therefore, this is not a case of the treasurer of the church having received a fund for the church and having misapplied same. That while it is true that the plaintiff was represented by a board of trustees, duly elected in conformity with the charter of the church, and that the defendant was the treasurer thereof, and that, as such, both the board of trustees and himself are liable to the church for their false or wrong-doings, they are only incidentally liable to the church as the administrators of the trust fund which had been donated to the church, and that the responsibility of the defendant arises with the board of trustees conjointly, and they are responsible to the church for their administration of said fund.

We append below, extracts from the reasons of the judge *a quo* for the rendition of the judgment appealed from:

"On the merits of plaintiff's claim, the record discloses that defendant has wrongfully received the trust funds of the church, dedicated, by the will of Kasper Auch, to the poor of said church. It was out of the power of the church to apply this trust fund to the payment of defendant's salary, as pastor. To the argument that the church directors borrowed the money from the poor fund, and with the borrowed money paid the defendant's salary, the answer is (1) that defendant as a member of the board, participated in the wrongful act, and was the beneficiary; (2) that the act was *ultra vires* and void; (3) that it was taking the fund for a purpose not warranted by law, by indirection, and turning it over to the defendant; (4) that defendant knew all this, as treasurer of said fund, and not only as member of the board, but because the by-laws, adopted with reference to this fund, and of which he must have had knowledge, expressly prohibited any such use.

"Defendant must be charged with knowledge of the law, and, also, with knowledge of all that concerned the keeping and use of this trust fund for the poor, for he was pastor of the church, treasurer of the fund, and member of the board of directors, and, as a fact, kept the records and the accounts.

"While defendant is thus held to knowledge of the law, still, as a fact, I acquit him of intentional wrong. The board was as wrong as he was, but I doubt not they all thought the church was poor, and that, in using the fund to support the church and its pastor, they were not acting wrongfully.

"The proof shows that defendant was a dutiful pastor and teacher, and friend of his congregation. It is unfortunate that ill-advised counsel induced him to screen the property from pursuit by simulated acts, but it is to his credit that he broke away from this improper device, and removed the simulation. *  *  *

"This is not the case of one *tort-feasor* demanding restitution of another. It is the legal and proper action of the trustees of the church, demanding the return of what has been wrongfully taken, no matter by whose fault, from the poor fund, of which the *church is trustee.* The corporation is the plaintiff, and if its trustees have, with reference to this fund, acted wrong, their wrongful act does not stay its hand, nor estop it from asserting its proper demand for the undoing of said wrong, and the recovery of said fund.

"Much could be said on this subject, but it is not necessary. This litigation has been bitter, but I trust the party feeling will abate. Defendant has served well his congregation as pastor for many years. What is honestly due to him, I doubt not will be paid, if not by the plaintiff church, by reason of its poverty, perhaps by the general authorities of the church. His account can be easily stated, and what he has received from this congregation and from the church, is susceptible of record and proof; and if any balance should be found due, it will be paid, after plaintiff makes restitution of the poor fund which he has wrongfully received."

With some few additional observations, his reasons are closed with the following statement:

"Defendant's plea of estoppel, based on certain acts of the trustees of the church, before and since this suit, cannot shield him. He has the money and property of the church *held by the church* for the relief and benefit of the poor. When he received this trust fund from the directors, he, as treasurer and pastor, *knew* that the directors had no legal right, or power, thus to divert it, and worst of all, defendant, himself, was one of the directors and trustees who thus wrongfully diverted it and wrongfully made him the beneficiary."

The theory upon which the judge *a quo* rested the defendant's re-

sponsibility is that he received from the board of trustees the money which they borrowed from the fund in immediate payment of the arrearage due him for back salary, as well as of his annual salary thereafter. That he did not borrow the money as an investment, nor with the expectation of making any return for it; but on the contrary, he received the money from the board of trustees with the distinct understanding that it was a payment made to him by the church, and out of the funds from which he had no right to receive payment. That he received the premium bonds as a donation outright from the board of trustees, well knowing that they had no authority to donate them.

On the plainest principles of law and justice, he is liable to make restitution of the money, and the city premium bonds he received.

Inasmuch as this suit is against the defendant solely as the treasurer of the trust fund, and agent of the corporation, and not in the capacity of a member of the board of trustees, the only judgment which can be rendered against him is for such portion of the trust fund as may be on hand, and such portion thereof as may have been received and used by him on his personal account for services as minister, or otherwise.

This suit does not call him to account for any transaction of the board of trustees of which he was a member, nor does it seek to hold him liable for any act of his as a member of the board of trustees *per se.*

With this statement of facts as they appear on the record kept upon the official minutes of the board of trustees, and of the trust fund before us, we are prepared to make brief analysis of the parol evidence as explanatory thereof, and apply same to the issues under examination.

Very nearly all the witnesses who were interrogated on behalf of the plaintiff, were elders of the church, and, at different times during the period embraced by the transactions enquired about, members of its board of trustees; and the trend of their testimony is to the effect that, notwithstanding they admit the genuineness of their signatures as they appear to be signed to the various resolutions of the board authorizing and approving the acts done on the part of the church corporation, they executed same *pro forma,* at the request and solicitation of the defendant, and trusting in his truthfulness and honesty as their minister— he having the exclusive charge of the minute book in which he kept an account of all the proceedings of the board.

But there were many of the members of the board of trustees who were interrogated as witnesses for the defendant, whose testimony affirms the correctness of the minutes as they were kept by the defendant.

and tends to show that plaintiff's witnesses possessed, at the time, the fullest knowledge of all the transactions therein detailed and gave to them their unqualified sanction.

We have made, from the record, the following extracts from the testimony of Fridolin Hoffman, one of the trustees of the church during the time these transactions occurred, viz:

"Q.—Those minutes were written out by Mr. Riedy, were they not?

"A.—Yes, sir.

"Q.—The minutes of the meeting?

"A.—Yes, sir; the minutes were read out at the meeting and they came before the board before being approved.

"Q.—Did you always understand what was in the minutes when they were read?

"A.—Yes, sir; I speak German and English, both.

"Q.—Now, Mr. Hoffman, was there ever any money borrowed from the Kasper Auch Fund by the board of trustees in order to pay the obligations of the church? * * * during your term of service as trustee?

"A.—Yes, sir; there was.

     *       *       *       *       *       *       *

"Q.—Now, Mr. Hoffman, every time, during the time you were trustee—every time there is an entry in the minutes during the time you were trustee or president—every time an entry is made in the minutes that the board of trustees have borrowed a certain amount from the Kasper Auch fund, was that done with your knowledge?

"A.—Yes, sir.

"Q.—And with your consent?

"A.—Yes, sir.

"Q.—Mr. Hoffman, did you ever find that Mr. Owen Riedy had ever appropriated any portion of the Kasper Auch fund to his own use without permission from the board of trustees?

"A.—No, sir; I did not. Mr. Riedy asked always the board of trustees; when he asked for his salary, he asked the board of trustees. *We borrowed from the Kasper Auch fund to pay his salary. He always asked the board of trustees when he needed money, and the book shows it on those grounds.

"Q.—Did Mr. Riedy ever ask permission from the board of trustees to take money out—did he ever ask to be allowed to take money from

the Kasper Auch fund, or did he ask you for his salary for a demand of what was due him?

"A.—He asked for his salary to be paid by the board, and we added it in the amount due him; then money was borrowed from the 'poor fund' to pay him with, at 3 per cent. interest.

"Q.—Then, according to your understanding, Mr. Riedy has never appropriated the Kasper Auch fund to his own use?

"A.—No, sir; he did not.

"Q.—According to your understanding, the board of trustees borrowed that money, and used part of it to pay his salary?

"A.—Yes, sir.

"Q.—Did the board of trustees ever have enough money in their hands belonging to the church with which to pay Mr. Riedy's salary?

"A.—No, sir.

"Q.—During the time you were a trustee?

"A.—No, sir.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q.—Was not Mr. Mining one of the trustees?

"A.—Yes, sir; he was president.

"Q.—Was he a trustee during the time you were a trustee?

"A.—Yes, sir.

"Q.—Did Mr.—were those matters, as to whether the trustees should borrow from the Kasper Auch fund and use part of the money to pay Mr. Riedy's salary—was that ever discussed in the presence of Mr. Mining?

"A.—Yes, sir; Mr. Mining was present at the meetings: he was acting president of the board.

"Q.—Did Mr. Mining ever make any objections to that?

"A.—No.

"Q.—Did he ever get up in the meetings and say 'you have no right to use that trust fund to pay your pastor?'

"A.—No, sir.

"Q.—Did any of the trustees, Mr. Hoffman, at any time, say that that money could not be borrowed—that it was a trust fund—was that ever said in your presence?

"A.—No, sir.

Again:

"Q.—Then, Mr. Hoffman, the charge made against Mr. Riedy that

he appropriated the whole of the Kasper Auch fund to himself is false,
is it not?

"A.—Yes, sir; it is."

Again:

"Q.—Mr. Hoffman, did the board of trustees ever loan any of that
money to members of the board of trustees as an investment?

"A.—Yes, sir; they did.

"Q.—Did Mr. Fritz Mining ever borrow any of that same trust fund?

"A.—I think he borrowed some, but I do not recollect how much.".

Fred. Rupert, on cross-examination makes quite a similar statement,
in many particulars, to that of Hoffman.

Henry Rebenack, a witness for defendant, on being shown many of
the notes which apparently represent loans to different members of the
board of trustees from the trust fund, identifies their signatures, and,
also, those of the officers of the board who signed the minutes authoriz-
ing the loans to them, many of which had been disavowed by the parties
thereto, in testifying in behalf of the plaintiff.

He states that when these loans were made, same were made with his
full knowledge and consent, and with that of the other members of the
board of trustees.

"Q.—Now, Mr. Rebenack, did you ever hear, during the time you
were a member of the board of trustees, any complaints made about the
use of that fund in the manner in which it was used either by Mr.
Mining, or Mr. Luckerman, or Mr. Frederick Rupert?

"A.—No."

Mr. Henry Rebenack's testimony is much to the same effect.

At this juncture, and before the closing of defendant's testimony, the
defendant being then personally present in court, tendered himself as
a witness for the plaintiff, if its counsel desired to use him as such—
declaring at the same time that he stood upon the record and the testi-
mony that had been introduced; but plaintiff's counsel did not avail
himself of the offer. By this means the defendant relieved himself of
the imputation of blame for failing to testify as a witness in his own
behalf.

From all the testimony in the record, two propositions appear to be
well and clearly established (1) that no part of the Kasper Auch trust
fund has been traced into the possession of the defendant, save and ex-
cept that which was applied to the payment of the arrears of his salary,
and the premium bonds which were donated to him; (2) and that that

portion of said fund was borrowed therefrom by the board of trustees, and by *them subsequently* paid to the defendant on account of the salary that was due him.

The evidence further discloses that the only questionable transaction that the defendant engaged in was that in reference to the Rebenack notes which were made the object of the attachment.

But the minutes of the board and of the trust fund show that he really held same for account of the trust fund as a loan as an investment; and that the defendant disclaimed any interest whatever in them.

These two facts are recognized by the judge *a quo* in his reasons for judgment, wherein he states, that while the loan represented by these notes to the Rebenacks apparently was one made by the defendant individually, he had made truthful and honest representations in the minutes he kept of the trust fund, and those of the proceedings of the board which authorized the loan to the Rebenacks and in their names.

The fact is that the Rebenacks regularly paid interest on those notes, and made some partial payments of the capital which were properly credited to the trust fund, thus evidencing defendant's disclaimer of ownership thereof.

True it is, as alleged in plaintiff's supplemental petition, that the title to the property purchased was, at first, taken in the name of the defendant's wife, but she subsequently executed a deed to the two Rebenacks for the price of $1866.00, which was represented by the purchasers' several promissory notes bearing interest at six per cent., and payable at different dates in the future.

Being at the date of these transactions treasurer of the trust fund, the defendant was the proper and legal custodian of those notes as of all others which represented loans made as investments; and the supplemental petition of the plaintiff in which it is made to claim an attachment, the admission is made "that said Owen Riedy *reported to the board of trustees of petitioner that he held said notes for account of the church,* and had invested a portion of said Kasper Auch fund therein, and said notes are the property of petitioner and are in possession of the said Owen Riedy." (Our italics.)

Considered in the light of these established facts and judicial admissions, the circumstance of the original deed having been taken in the name of the defendant's wife, is relieved of any possible significance in this controversy, because the transaction with the Rebenacks had been completed prior to the institution of this suit and appropriate entries

thereof had been made in the minute book of the trust fund, and same had been ratified and approved by the board of trustees.

The judgment of the court a qua was (1) in favor of the plaintiff for the four Rebenack notes aggregating $1866.00 in principal, sustaining the writ of sequestration; (2) decreeing the defendant to surrender seventy city premium bonds of the face value of twenty dollars each, or to pay to the plaintiff their alternate value of $2940.00, with legal interest; and that the defendant be condemned to pay to the plaintiff the additional sum of $7712.00, with interest, sustaining the writ of attachment with privilege on the property seized.

It further rejected and disallowed the demands of the defendant for the damages occasioned by the sequestration and attachment; and dismissed, as of non-suit, his demand in reconvention for the amount of his salary.

From that judgment the defendant has prosecuted a devolutive appeal.

The theory upon which judgment was rendered against the defendant was solely and only that he, whilst treasurer of the trust fund, received from the board of trustees different sums in payment of his salary as pastor of the plaintiff church, the same having been by them borrowed from the trust fund in pursuance of formal resolutions and with his full knowledge.

The defendant has been brought to account for these sums as having been by him unduly received, on the ground that these pretended negotiations on the part of the board of trustees were *ultra vires* acts and void, because they were altogether without legal capacity to thus deal with and dispose of the trust fund while under their administration; and that the defendant, sustaining a trust relation to this fund had no legal right to receive and use same in payment of his salary, albeit same was paid him on the authority of a formal resolution of the board of trustees.

These propositions are well established by the proof in the record, and were sustained by the judge a quo.

In so far as the four Rebenack notes are concerned, there is no complaint of the decree. The defendant does not dispute the fact that they were the property of the church, and are so declared in the official minutes of the trust fund.

There is no question as to the correctness of the decree in reference to the amount of the city premium bonds which the defendant received,

but we have examined and restated the *data* upon which we rest our decree.

The following is the character of the obligations which the president and secretary of the board of trustees executed as representing the loans made from the trust fund, the proceeds of which were paid to the defendant on his annual salary as pastor of the church, and in other ways, viz:

$2370.36                          "New Orleans, Sept. 3rd, 1888.

"The Immanuel Presbyterian Church of New Orleans, La., by resolution of its board of trustees, recorded in the minutes of said board under this date, and on page —, borrows from its Poor Fund, two thousand three hundred and seventy 36-100 dollars, with 3 per cent. per annum from date.   (Signed)

"CHARLES REBENACK, *President.*

"HEINRICH REBENACK, *Sec. Pro. Tem.*

"*Board of Trustees.*"

All others appear to be of like form, and were employed as a means of withdrawing the necessary funds with which to pay the defendant's salary, and the withdrawal of the city premium bonds that had been donated to him.

Judging by the substance of the testimony and the appearance of the obligations which are annexed to the record in the original, the following is a list showing the dates and amounts thus withdrawn from the trust fund, viz:

One note dated August, 1888, for..........................$2,000 00
One note dated September 3rd, 1888, for................... 2,370 36
One note dated January 1st, 1890, for....................   848 92
One note dated January 12th, 1891, for...................   746 44
One note dated July 13th, 1891, for......................   870 00
One note dated October 3rd, 1892, for....................  *400 00
One note dated March, 1894, for..........................   815 71
One note dated March 15th, 1895, for.....................   720 00
One note dated July 29th, 1895, for......................   375 00
One note dated December 9th, 1895, for...................   390 00
One note dated August 3rd, 1896, for.....................   720 00
One note dated February 23rd, 1897, for..................   145 00

    Aggregating......................................$10,401 40
*A balance.

But this aggregate embraces the amount of the face value of the premium bonds that were donated to the defendant as well as the amount he claimed to be due him by the church at the time it received the Kasper Auch donation in 1888; and the minutes of the board which authorized these loans disclose that the notes for $2000, of date August 6th, 1888, represents fifty city premium bonds, aggregating, in face value, $1000, and that the remainder of $1000 in cash was made to the church congregation to enable it to make repairs on the church edifice, to build a school-house and purchase an organ; and that the note of September 3rd, 1888, for $2370.36 represented four hundred dollars of city premium bonds and only $1970.36 in cash.

Consequently, there should be deducted from the foregoing aggregate, the sum of $2400, reducing same to $8001.40 as the correct amount due the plaintiff.

The judgment appealed from is correct, in so far as it decrees the plaintiff entitled to the possession of the four Rebenack notes, aggregating eighteen hundred and sixty-six dollars, representing a loan of trust fund as an investment, and the seventy city premium bonds of the face value of fourteen hundred dollars, as forming a part of said fund; but while it decreed the plaintiff entitled to recover of the defendant only $7712, instead of $8001.36 in money, same cannot be amended and increased in favor of the appellee without any prayer to that effect, and must be affirmed.

A careful investigation of this case has convinced us that it was correctly disposed of in the lower court.

Judgment affirmed.

Rehearing refused.